UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------x

ANGELA TRINGONE,

                Plaintiff,           **MEMORANDUM & ORDER**
                                     18-CV-1896(EK)(ARL)

        -against-

NEW YORK STATE OFFICE OF MENTAL
HEALTH and ROSALIE BANOVICH,

                Defendants.

-------------------------------------x
ERIC KOMITEE, United States District Judge:

        Angela Tringone was employed by the New York State
Office of Mental Health ("NYSOMH") as a social worker beginning
in 2013, providing psychological counseling to clients.  She
resigned her position with NYSOMH in February 2017.

        Plaintiff claims that she was subject to a hostile
work environment at NYSOMH beginning in the second half of 2016.
This allegation is based primarily on the behavior of certain
registered nurses on NYSOMH's staff.  Plaintiff also alleges
that when she complained about her work environment, NYSOMH
employees retaliated by subjecting her to increased scrutiny, a
write-up for "fabricated performance issues," and a transfer to
a distant facility, among other things.  NYSOMH denies that
Plaintiff was subject to a hostile work environment and contends
that Plaintiff's performance issues were real, longstanding, and

rigorously documented.  In that vein, NYSOMH points to a steady stream of record evidence regarding the Plaintiff's difficulties with supervisors and colleagues, much of which predates the Plaintiff's allegations.

Plaintiff sued NYSOMH, alleging discrimination and retaliation under Title VII.  She also sued a supervisor, Deputy Director Rosalie Banovich, for the same claims under the New York State Human Rights Law.  NYSOMH and Banovich both now move for summary judgment.  For the reasons stated below, I conclude that Plaintiff has failed to adduce sufficient evidence that she was subjected to a hostile work environment or, in connection with her retaliation claims, that she was subjected to any materially adverse action.  Accordingly, I grant summary judgment on all claims.

## I.  Background[1]

### A.  Factual Background[2]

NYSOMH hired Plaintiff in May 2013 as a Licensed Master Social Worker (Level II).  NYSOMH 56.1 ¶ 10.  Plaintiff's position entailed, among other things, working on a team that provided training and support to people with mental illnesses to assist them with independent living.  *See id.* ¶ 8.  She began working out of the "Yaphank Center" of NYSOMH's Pilgrim Psychiatric facility in Medford, New York.  ECF No. 67-1 ¶ 3 (Declaration of Rosalie Banovich).

#### 1.  Probationary Period

At the start of her employment, Plaintiff was subject to a probationary period that was initially set to last between twenty-six and fifty-two weeks.  NYSOMH 56.1 ¶ 11.  On May 29, 2014, just as that period was about to expire, NYSOMH extended it by 115 workdays to cover time that Plaintiff had taken "off

---

[1] These facts are drawn from the parties' submissions on summary judgment, including their Local Rule 56.1 Statements.  Defendant Banovich's Rule 56.1 Statement is referred to as "Banovich 56.1" (ECF No. 67-2); NYSOMH's Rule 56.1 Statement as "NYSOMH 56.1" (ECF No. 68-7); Plaintiff's statements in opposition as "Pl. 56.1 (Banovich)" (ECF No. 69-25) and "Pl. 56.1 (NYSOMH)" (ECF No. 69-26), respectively.  The facts are viewed in the light most favorable to Plaintiff.  Citations to a party's Rule 56.1 Statement incorporate by reference the documents cited therein.  For convenience, Defendants' supporting memoranda of law will be referred to as "Banovich. Br." (ECF No. 67-3) and "NYOSMH Br." (ECF No. 68-8) and Plaintiff's opposition as "Pl. Opp." (ECF No. 69-27).

[2] This section proceeds chronologically, beginning with the record evidence relating to Plaintiff's performance issues and then proceeding to the evidence underlying her hostile work environment allegations and later allegations of performance deficits.

duty." *Id.* ¶ 12.  As extended, the probationary period was set to terminate on November 7, 2014.  ECF No. 68-4 at 2 (letter dated May 29, 2014).[3]

Shortly before the extended period expired, NYSOMH rated Plaintiff's attendance record "unacceptable" based on her absences and punctuality issues.  ECF No. 68-4 at 4 (Probation Report dated October 24, 2014).  As a consequence, NYSOMH required Plaintiff to complete a second probationary period.  *See* ECF No. 68-4 at 6 (letter dated November 7, 2014).  Plaintiff contends that many of her absences were due to a "high-risk" pregnancy.  *See* Deposition Excerpts of Angela Tringone ("Pl. Dep.") 103:2-4, ECF No. 69-1.  But her counsel conceded that at least some of Plaintiff's absences were unauthorized and that some were unrelated to the pregnancy.[4]

2.  <u>Negative Feedback and First Transfer</u>

Plaintiff ultimately completed the probationary period, but she continued to receive negative feedback.  On July

---

[3] Page numbers in citations to record documents refer to ECF pagination.

[4] See Transcript of Oral Argument held on October 12, 2021 18:4-7, ECF No. 79 ("[The Court]: I'm not asking about whether [each absence] was related to her condition so much as whether she had authorization for it.  You're not citing record evidence that she did, right?  A: Aside from the sick leave letter . . . there is nothing in the record that demonstrates that she was authorized for every single absence."); *see also id.* at 18:8-11 ("Q. And you're not arguing that she was authorized for every single absence?  A. I don't believe every single absence.").  The Court went on to ask whether the record contained evidence that Plaintiff had, at times, not shown up at work for no reason at all.  Plaintiff's counsel replied: "Sprinkles of it, yes." *Id.* at 18:18-22.

14, 2015, clinic administrator John Mahon counseled Plaintiff about her recordkeeping.  NYSOMH 56.1 ¶ 15.  Mahon's contemporaneous notes reflect that they discussed "significant documentation deficits," including one instance in which Plaintiff failed to complete a "biopsychosocial" report for a client in treatment for more than five months, despite the report having been due within thirty days of the client's admission.  *See* ECF No. 69-11.  Mahon also noted that several of Plaintiff's "treatment plans" lacked the required client signatures, prescriber signatures, or monthly progress notes. *Id.*  Mahon requested that Plaintiff's "supervision frequency" be adjusted to "weekly."  *Id.*  Plaintiff admits that she was counseled for poor record documentation but denies that she had significant documentation deficits.  Pl. 56.1 (NYSOMH) ¶ 15.

Two weeks later, Mahon counseled Plaintiff regarding her time and attendance record for 2015.  NYSOMH 56.1 ¶ 16; *see also* ECF No. 69-12.  Mahon noted that Plaintiff's timesheets indicated a total of sixteen unscheduled "call in sick" days in 2015 (which was barely half over at that time), as well as several days in which Plaintiff arrived late.  ECF No. 69-12. Plaintiff admits these allegations.  Pl. 56.1 (NYSOMH) ¶ 16.

In April 2016, Plaintiff was transferred to the Suffolk Mobile Integration Team ("MIT") with the same title and salary.  NYSOMH 56.1 ¶ 17.  (This is not the transfer about

which Plaintiff complains.)  The MIT was based out of NYSOMH's
Yaphank Center, where Plaintiff had already been working, but
her appointment to the MIT required Plaintiff to travel more.
*See* ECF No. 79 10:9-16; *see also* ECF No. 68-5 at 30 (Draft
Investigation Report).

On the MIT, Plaintiff reported to Team Leader Martin
Godek; Godek, in turn, reported to defendant Banovich.  NYSOMH
56.1 ¶ 4; Banovich 56.1 ¶ 23.  Godek was later interviewed for
the Investigation Report that NYSOMH compiled after Plaintiff
complained about her working environment.  The report reflects
Godek's observations, made sometime after Plaintiff joined his
team, that Plaintiff was not following through on obligations
like scheduled meetings with clients, was not responsive to
supervisors' communications, and had documented a "low number"
of patient visits.  ECF No. 68-5 at 10-11.

3.   Hostile Work Environment Allegations and Additional
     Counseling

Plaintiff points to three incidents in particular in
support of her hostile work environment claim.  All three
occurred during the Fall of 2016.

The first incident allegedly occurred on September 27,
2016.  Plaintiff was in a room with several NYSOMH employees,

including a nurse named Jamie Iacobelli.[5]  NYSOMH 56.1 ¶ 18.

According to Plaintiff, Iacobelli attempted to show her a video

of a "woman's rear end with cereal in it" on her cellphone.  Pl.

Dep. 58:19-23.  Plaintiff refused Iacobelli's invitation to

press play on the video, but testified that she was exposed to

the still image for "three or four seconds."  *Id.* at 59:19-21;

*see also* NYSOMH 56.1 ¶ 19.  Plaintiff testified that she told

Iacobelli to "Get it out of my face.  I don't want to see that."

Pl. Dep. 59:25-60:2.  After that, Plaintiff testified, "it was

just dropped.  I didn't want to talk about it."  *Id.* at 60:6-7.

This incident left Plaintiff feeling "nauseous," but she chose

not to report it at that time.  *Id.* at 61:11-12.[6]

The second incident of alleged harassment occurred

on October 7, 2016.  Plaintiff heard from a colleague (first

name McReynold)[7] that another coworker (Tom) had told

Iacobelli that men sent him photographs of their penises on

---

[5] Iacobelli was one of the employees who, according to Godek, had
reported that Plaintiff was not "working well" with the Mobile Integration
Team and was frequently unable to keep her patient meetings.  ECF No. 68-5
at 11.  Plaintiff named Iacobelli in her complaint but dismissed her on
December 19, 2019.  ECF No. 62.  This opinion refers to Iacobelli (sometimes
spelled Iacabelli in the record) by her full name because she was originally
a named party.

[6] Plaintiff apparently did report this episode on October 18, 2016,
after the second and third episodes occurred.  ECF No. 68-5 at 23.

[7] This opinion uses only the first names of employees who are the
subject of lurid allegations but no formal claim (unlike Iacobelli, who was
initially named as a defendant).

his Craigslist account.  NYSOMH 56.1 ¶ 22.  Plaintiff told McReynold that this was "gross."  Pl. Dep. 72:17.  Following the incident, Plaintiff felt "sick" because she had to work with a "bunch of perverts."  *Id.* at 75:2-4.  Plaintiff testified that she told McReynold not to repeat his behavior, and he agreed.  *Id.* at 74:4-13.

On October 11, 2016, Plaintiff reported the Craigslist conversation to Brooke Gottesman, a clinical supervisor.  ECF No. 69-18.  A few days later, Plaintiff formally complained to a social work "director" who, in turn, reported this incident to NYSOMH's Diversity Planning office. NYSOMH 56.1 ¶ 25.

On October 14, 2016, Team Leader Godek and defendant Banovich (Godek's supervisor) discussed Plaintiff's performance again.  In an email, Banovich reported that she met with Plaintiff about Plaintiff's having reported only "2 services" between September 1 and October 3.  ECF No. 69-15.  Godek replied that Plaintiff had "a tendency of wandering too much around the clinic in Suffolk."  *Id.*  Both supervisors raised the idea of another transfer, should Plaintiff fail to show improvement.  *Id.*  Godek wrote that he could "keep a better eye on her" at the contemplated facility, "and the team there I don't think would tolerate her behavior."  *Id.*

The third instance of alleged harassment occurred on October 17, 2016, when Plaintiff was in earshot of a conversation between Iacobelli and a coworker whose first name is Regina.  Iacobelli told Regina that a friend of Iacobelli's had seen a picture of Regina and said she looked "hot" and had "nice t*ts and a**."  NYSOMH 56.1 ¶ 26. Iacobelli denies making that comment.[8]  Plaintiff reported this incident to NYSOMH's Office of Diversity Planning and Compliance days later.  ECF No. 69-18.

On October 17, 2016 — the day of the conversation about Regina — Banovich contacted Suzanne Streng (a human resources specialist) regarding Plaintiff's performance issues. ECF No. 68-5 at 22.  Banovich reported that Plaintiff had been exhibiting "irresponsible behavior," including by running out of gas during workday travel; failing to respond to supervisors' communications; and having difficulties getting along with her team.  *Id.*[9]  Banovich inquired about the possibility of

---

[8] Interviewed later, Iacobelli stated that she told Regina that her friend had "complimented her," saying that "she was a beautiful older lady." ECF No. 68-5 at 24.  Regina told investigators that Iacobelli "may" also have quoted her friend as saying that Regina had "nice boobs."  *Id.* at 14.  Regina further stated that she and Iacobelli had been "trying to lose weight" and that she took Iacobelli to be paying her a compliment.  *Id.* at 14-15.

[9] These facts are contested.  I recite them because they are relevant to Plaintiff's contention that the Defendants "fabricated" her performance issues, and because they precede the transfer about which Plaintiff complains.

reassigning Plaintiff to another facility where she could receive "closer supervision." *Id.*

On October 19, Plaintiff filed a complaint alleging that Iacobelli sexually harassed her. NYSOMH 56.1 ¶ 29. NYSOMH initiated an investigation in response. *Id.* ¶ 30. NYSOMH personnel interviewed twelve witnesses (including Iacobelli), reviewed documents, and compiled the Draft Investigation Report discussed above. *Id.; see generally* ECF No. 68-5.

The investigation determined that there was insufficient evidence to support the claim that Iacobelli described Regina as having nice "t*ts and a**." ECF No. 68-5 at 45. Iacobelli did admit, however, to "engaging in speech of a sexual nature in the workplace by describing out loud the text received from her phone." *Id.* Iacobelli was placed on probation, *id.* at 30; but the investigators found insufficient evidence to support Tringone's claims that Tom "engaged in speech of a sexual nature," or that Godek, Banovich, or Gottesman had retaliated against her. *Id.* at 45-46.

In January 2017, Godek counseled Plaintiff about her disruptive behavior during meetings and training sessions, ECF No. 69-10 (report of "counseling outcome"), and issued Plaintiff a written counseling memorandum. ECF No. 69-9; *see also* NYSOMH 56.1 ¶ 38. The memorandum states that a copy of it would be filed in Plaintiff's "personal history folder in the Human

Resources Department."  ECF No. 69-9.  The memo details several incidents occurring between October 2016 and December 2016.  *Id.* Among other things, Godek reported, Plaintiff left a morning meeting "abruptly[,] claiming a need to go to pick up a letter for a client" without ascertaining that it was acceptable to depart.  *Id.*  In a meeting held to address "ongoing issues" within the MIT, Godek observed that Plaintiff "stared at the ceiling . . . rolled [her] eyes and began doing paperwork as Ms. Banovich was talking."  *Id.*  Plaintiff denies that she was disruptive in at least one meeting memorialized in the memo, instead contending that she "did not act differently than she normally acts during meetings, *i.e.* keeping her head down and shuffling paper."  Pl. 56.1 (NYSOMH) ¶ 38.

On January 26, 2017, Gottesman verbally counseled Plaintiff to complete her notes and contact sheets in a timely fashion.  NYSOMH 56.1 ¶ 39.

NYSOMH's Investigation Report reflects that on February 14, 2017, Plaintiff's attorney sent a letter to NYSOMH attaching Plaintiff's Charge of Discrimination form.  ECF No. 68-5 at 3.  The next day, Plaintiff filed her complaint with the Equal Employment Opportunity Commission ("EEOC").  ECF 69-13 at 2.

On February 27, 2017, Godek advised Plaintiff that she would be transferred from the Yaphank MIT to NYSOMH's Buckman

Center in Brentwood, New York.  NYSOMH 56.1 ¶ 41; *see also* ECF No. 69-3 (Transfer Letter dated February 27, 2017).[10] Plaintiff's salary, benefits, title, and hours remained the same.  NYSOMH 56.1 ¶ 42; ECF No. 69-3.  Later that day, Plaintiff resigned her position.  In her handwritten resignation letter, she asserted that she had been "constructively discharge[d]" in retaliation for making the EEOC complaint.  ECF No. 69-5.

Throughout the period of Plaintiff's employment, she and other NYSOMH employees received sexual harassment training annually.  This training included specific procedures for reporting sexual harassment.  *See* NYSOMH 56.1 ¶ 37; *see also* Pl. Dep. 29:3-30:3.

## B.  Procedural History

As noted above, Plaintiff filed a discrimination complaint with the EEOC on February 15, 2017.  The EEOC later issued a right-to-sue letter.  Plaintiff commenced this action in March 2018, alleging violations of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000, and the New York State

---

[10] The investigation report indicates that this transfer occurred after consultation with NYSOMH's Human Resources department, Counsel's Office, and Bureau of Diversity Planning and Compliance.  ECF No. 68-5 at 46.

Human Rights Law ("NYSHRL"), Executive Law §§ 290-301.  *See*
Complaint ("Compl."), ECF No. 1.[11]

Defendants now move for summary judgment.  NYSOMH
argues that the alleged harassment was insufficiently "severe or
pervasive" to establish a hostile work environment, and
that Plaintiff suffered no "adverse employment action" and
cannot (in any event) show a causal connection between her
complaints and any purportedly adverse action NYSOMH took.
NYSOMH Br. at 2-3.  Banovich asserts that she is not an
"employer" within the meaning of the NYSHRL and that she did not
retaliate against Plaintiff.  *See* Banovich Br. at 2-3.

## II.  Summary Judgment Standard

Summary judgment is appropriate if the record
demonstrates that "there is no genuine dispute as to any
material fact and the movant is entitled to judgment as a matter
of law."  Fed R. Civ. P. 56.  "A fact is material for these
purposes if it might affect the outcome of the suit under the
governing law.  An issue of fact is genuine if the evidence is
such that a reasonable jury could return a verdict for the

---

[11] Plaintiff's complaint also named Godek and Iacobelli as defendants.
The complaint did not clearly specify which claims were alleged against which
defendant(s).  Plaintiff later dismissed all claims against Godek and
Iacobelli. ECF Nos. 62 (Iacobelli), 63 (Godek).  Following oral argument,
Plaintiff submitted a letter at the Court's request clarifying the causes of
action against each remaining defendant.  ECF No. 76.

nonmoving party." *Lovejoy-Wilson v. NOCO Motor Fuel, Inc.*, 263 F.3d 208, 212 (2d Cir. 2001).[12]

The moving party has the burden of demonstrating the absence of a question of material fact. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986). If the movant carries its burden, "the nonmoving party must come forward with admissible evidence sufficient to raise a genuine issue of fact for trial in order to avoid summary judgment." *Jaramillo v. Weyerhaeuser Co.*, 536 F.3d 140, 145 (2d Cir. 2008). If the non-moving party fails to do so, the claim must be dismissed. The entry of summary judgment is appropriate "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

### III. Discussion

Plaintiff asserts that her colleagues' actions gave rise to a hostile work environment, and that when she complained about these actions, Defendants retaliated against her. The standards under Title VII and the NYSHRL are the same for both the hostile work environment and retaliation claims. *See Summa v. Hofstra Univ.*, 708 F.3d 115, 123-24 (2d Cir. 2013) (hostile

---

[12] Unless otherwise noted, when quoting judicial decisions this order omits all alterations, citations, footnotes, and internal quotation marks.

work environment); *Hicks v. Baines*, 593 F.3d 159, 164 (2d Cir. 2010) (retaliation).

A.  **Hostile Work Environment**

> To prevail on a hostile work environment claim, a plaintiff must show that the alleged harassment was "sufficiently severe or pervasive to alter the conditions of the victim's employment." *Perry v. Ethan Allen, Inc.,* 115 F.3d 143, 149 (2d Cir. 1997).  Under Title VII, "isolated incidents (unless extremely serious) will not amount to" a hostile work environment.  *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998).  Multiple events in series, taken together, "must be more than episodic; they must be sufficiently continuous and concerted in order to be deemed pervasive." *Alfano v. Costello*, 294 F.3d 365, 374 (2d Cir. 2002).  "Title VII is not a general civility code." *Holtz v. Rockefeller & Co., Inc.,* 258 F.3d 62, 75 (2d Cir. 2001).  Moreover, "it is axiomatic that in order to establish a sex-based hostile work environment . . . a plaintiff must demonstrate that the conduct occurred because of her sex." *Alfano*, 294 F.3d at 374.

> The three incidents Plaintiff invokes over her nearly four-year tenure at NYSOMH do not meet this standard.  *See DelaPaz v. N.Y. City Police Dep't*, No. 01-CV-5416, 2003 WL 21878780, at *3 (S.D.N.Y. Aug. 8, 2003) (Second Circuit has erected a "remarkably high" hurdle with respect to the level and

frequency of offensive conduct required to sustain a hostile
work environment claim).  The first incident — involving the
cellphone image of a "woman's rear end with cereal in it," Pl.
Dep. 58:19-20 — was fleeting; Plaintiff testified that Iacobelli
held her phone up for "a few seconds . . . three or four
seconds."  *Id.* at 59:15-21.  Indeed, neither Iacobelli nor
Plaintiff actually pressed play.  *See* NYSOMH 56.1 ¶ 19.
Plaintiff testified that "I pushed her hand away," Pl. Dep.
59:17-18, and said "[g]et it out of my face."  *Id.* at 59:25.
Plaintiff paraphrased Iacobelli's response as follows:  "Oh,
come on.  It's not so bad, blah blah blah, you know, ha-ha-ha."
*Id.* at 60:4-6.  This ended the interaction:  "And then it was
just dropped.  I didn't want to talk about it."  *Id.* at 60:6-7.
Plaintiff did not alert management contemporaneously to this
incident.

          In general, incidents must be more than "fleeting" to
sustain a hostile work environment claim, *Postell v. Rochester
City Sch. Dist.*, 136 F. Supp. 3d 492, 502 (W.D.N.Y. 2015),
including where explicit imagery is involved.  *See Alfano*, 294
F.3d at 380.  Given that, district courts in this Circuit have
repeatedly granted summary judgment in cases involving incidents
similar to the one alleged here.  *E.g., Dotson v. City of
Syracuse*, No. 4-CV-1388, 2009 WL 2176127, at *15 (N.D.N.Y. July
21, 2009) ("The record establishes that plaintiff saw

pornography at the SPD on two occasions over a five to six month period . . . . [N]o reasonable factfinder could conclude that these two events were severe or pervasive to constitute a hostile work environment."); *Osorio v. Source Enter.*, *Inc.*, No. 5-CV-10029, 2006 WL 2548425, at *5 (S.D.N.Y. 2006) (evidence that plaintiff was exposed to "some lewd pictures posted in a back portion of the office and on a computer screen saver," together with an "isolated incident in which she saw male employees watching pornography in the mailroom," was insufficient to survive summary judgment).

The second incident involved a chain of communication with several links.  Plaintiff says she heard from a colleague (McReynold) that McReynold heard from Iacobelli that Iacobelli, in turn, heard from a staff psychologist named Tom that he (Tom) "had men on Craigslist send him pictures of their penises."  Pl. Dep. 72:8-12.  This is obviously inappropriate workplace conversation.  But McReynold's mention of this communication was (again) fleeting, and was accompanied by no display of the photos in question (at least in Plaintiff's presence).  Evidence that "colleagues discuss[ed] topics that were inappropriate and sexual in nature" is insufficient without more to sustain a hostile work environment claim.  *E.g.*, *Byrne v. Telesector Res. Grp., Inc.*, 339 F. App'x 13, 18 (2d Cir. 2009) (plaintiff's allegations that male co-worker gave out his fax number as

"25penis," that she overheard co-workers discussing topics that were sexual in nature, and that manager invited former employee who had been accused of discrimination to office party, were not severe or pervasive enough to give rise to a hostile work environment).

In the third incident, Iacobelli — the common factor in this series of allegations, as will be obvious by now — was talking to her coworker Regina with Plaintiff present. Plaintiff alleges that Iacobelli told Regina that she had shown Regina's picture to a friend, and the friend responded that Regina looked "hot" and had "nice t*ts and a**."  Pl. Dep. 94:22-95:1.  As with the Craigslist episode, Plaintiff is invoking a single comment that was not directed at her.

The Second Circuit has held that comments like this, even when directed at a plaintiff herself, may not suffice to establish liability.  In *Quinn v. Green Tree Credit Corp.*, a coworker "told Quinn she had been voted the 'sleekest a**' in the office and . . . on another occasion, he 'deliberately touched Quinn's breasts with some papers that he was holding in his hand.'"  159 F.3d 759, 768 (2d Cir. 1998), *abrogated in part on other grounds by Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101 (2002).  Accepting these allegations as true, the Court of Appeals still concluded that Quinn had "not adduced evidence sufficient to support a finding that she was subjected to abuse

18

of sufficient severity or pervasiveness as to alter the
conditions of her employment."  *Id.*

Here, as noted, Plaintiff was a bystander to the
conversation about Regina's photograph.  And courts have
suggested that comments directed at a third party, while still
relevant, are less supportive of a plaintiff's hostile work
environment claim.  *See, e.g.*, *Mohan v. City of New York*, No.
17-CV-3820, 2018 WL 3711821, at *15 (S.D.N.Y. Aug. 3, 2018)
("[E]ven assuming Kim's single reference to another employee
. . . bespoke racial animus, the [complaint] suggests that
Plaintiff only knew of this information secondhand, and this
comment was not directed at her."); *Kolenovic v. ABM Janitorial
Ne. Inc.*, No. 8-CV-67, 2009 WL 161064, at *2 (S.D.N.Y. Jan. 8,
2009), *aff'd in part, vacated in part, remanded sub nom.
Kolenovic v. ABM Indus. Inc.*, 361 F. App'x 246 (2d Cir. 2010)
("Nagrowski's boorish comments regarding a co-worker's anatomy,
his remark that a co-worker's thong underwear was exposed, and
the lewd statement concerning a cleaning woman were not directed
at Plaintiff, and Plaintiff can point to no adverse effect on
her job performance as a result of those comments.").[13]

---

[13] At the same time, "a plaintiff who herself experiences discriminatory
harassment need not be the target of other instances of hostility in order
for those incidents to support her claim."  *Whidbee v. Garzarelli Food
Specialties, Inc.*, 223 F.3d 62, 69 (2d Cir. 2000); *see also Perry*, 115 F.3d
at 149, 151.

Moreover, Plaintiff's deposition testimony undermines her reliance on this episode in support of her claim.  She did testify that Iacobelli's comment to Regina made her uncomfortable.  As is apparent from the deposition testimony below, however, Plaintiff's primary reaction appears to have been her desire to disparage her colleague, rather than her discomfort.

> Q.  How did you feel regarding the October 17, 2016 incident?
>
> A.  Surprised.
>
> Q.  Why were you surprised?
>
> A.  Because Regina does not have nice t*ts and a**.
>
> Q.  Did it offend you that somebody made a comment that somebody thought that somebody had nice T and A?
>
> A.  Yes.  Especially when it's untrue.

Pl. Dep. 95:24-96:9; *see Williams v. New York City Hous. Auth.*, 61 A.D.3d 62, 80 (1st Dep't 2009) ("[T]he only harassment allegation supported by evidence that could be credited by a jury consists of comments made in plaintiff's presence on one occasion in October 1998 that were not directed at her, and were perceived by her as being in part complimentary to a coworker.  These comments were . . . not actionable.").

Taken together, these incidents do not rise to the level of a hostile work environment.  In evaluating hostile work

environment claims, courts consider the "totality of the circumstances," *Pucino v. Verizon Wireless Commc'ns, Inc.*, 618 F.3d 112, 117 (2d Cir. 2010), including "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Harris v. Forklift Systems*, *Inc.*, 510 U.S. 17, 23 (1993).

In *Alfano*, the Second Circuit held that the plaintiff had introduced insufficient evidence to sustain a jury verdict on her hostile work environment claim.  294 F.3d at 382.  At trial, the plaintiff had introduced evidence that a supervisor told her she should not eat certain foods because she did so in a "seductive" manner; that someone had left a carrot and two potatoes in her mailbox, "arrang[ed] . . . to suggest male genitalia"; and that someone left a cartoon in her work mailbox containing vulgar sexual remarks, together with a reference to a colleague that the plaintiff had been investigated (and cleared) for having had an allegedly inappropriate workplace relationship with.  *Id.* at 370.  The panel ruled that these incidents, "taken together, are insufficient as a matter of law to meet the threshold of severity or pervasiveness required for a hostile work environment."  *Id.* at 376.

Given the Second Circuit's guidance, Plaintiff's claim cannot go forward. *See Mormol v. Costco Wholesale Corp.*, 364 F.3d 54, 59 (2d Cir. 2004); *Cristofaro v. Lake Shore Cent. Sch. Dist.*, 473 F. App'x 28, 30 (2d Cir. 2012). Defendants' motions for summary judgment on Plaintiff's hostile work environment claims — federal and state — are therefore granted.

**B.   Retaliation**

As noted above, Plaintiff reported these episodes to NYSOMH personnel (though the parties dispute whether she did so through the appropriate channels under NYSOMH's sexual harassment policies). Plaintiff claims that the hospital retaliated in several ways: by increasing supervision over her; by forcing her to "hash it out" herself with people she had accused of harassment; by Banovich "screaming" at Plaintiff in a hallway after a meeting, pointing a finger in her face in the process; by "writing plaintiff up" for "fabricated" performance issues and ordering verbal counseling; and by transferring Plaintiff to another facility. *See* Compl. ¶¶ 76-145.

The federal and state retaliation claims "are reviewed under the burden-shifting approach" of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 794 (1973). *Zann Kwan v. Andalex Grp. LLC*, 737 F.3d 834, 843 (2d Cir. 2013). Under the first step of that framework, the plaintiff must establish a prima facie case that her employer took "adverse action" against her as a result

of "protected" activity. *Cifra v. G.E. Co.*, 252 F.3d 205, 216 (2d Cir. 2001).

Once the plaintiff establishes a prima facie case, the burden shifts to the defendant to articulate a legitimate, non-retaliatory reason for its employment decision. *Id.* If the defendant carries this burden, the plaintiff must then come forward with evidence that the defendant's proffered reason is a "mere pretext for retaliation." *Zann Kwan*, 737 F.3d at 845. "Although intermediate evidentiary burdens shift back and forth under [the *McDonnell Douglas*] framework, [t]he ultimate burden of persuading the trier of fact . . . remains at all times with the plaintiff." *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 143 (2000).

Defendants contend that Plaintiff cannot make out a prima facie case because no factfinder could conclude, on this record, that she formed a "reasonable belief" that her rights had been violated. NYSOMH Br. at 9. They cite *Clark County School District v. Breeden*, 532 U.S. 268 (2001), which held that a plaintiff had not engaged in protected activity when "no one could reasonably believe" that the incident she complained of, involving one sexually suggestive comment by a coworker, violated Title VII. *Id.* at 270-71. That case is perhaps distinguishable in that it involved only a single incident, whereas Plaintiff here is alleging three. I need not resolve

this question, however, because Plaintiff has failed to allege that she was subject to any "materially adverse" retaliatory action.

Title VII's "antiretaliation provision protects an individual not from all retaliation, but from retaliation that produces an injury or harm." *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 67 (2006).  To be actionable, the asserted acts of retaliation must be "materially adverse" to the complaining employee.  *Id.* at 68.  This means that the challenged actions were "harmful to the point that they could well dissuade a reasonable worker from making or supporting a charge of discrimination."  *Id.* at 57.  Alleged acts of retaliation must be considered both separately and in the aggregate.  *Hicks v. Baines*, 593 F.3d 159, 165 (2d Cir. 2010).  Still, no number of non-actionable incidents, even in the aggregate, can amount to an adverse employment action: "Zero plus zero is zero." *Tepperwien v. Entergy Nuclear Operations, Inc.*, 663 F.3d 556, 572 (2d Cir. 2011).  The standard is objective.  *Hicks*, 593 F.3d at 165.  At bottom, the "petty slights or minor annoyances that often take place at work and that all employees experience do not constitute actionable retaliation."  *Id.*

    1.   "Increased Scrutiny" and Feedback

Several of Plaintiff's allegations in this regard can

be summarily dismissed.  Increased monitoring and supervision
are not materially adverse as a matter of law; they are,
instead, inherent in employee training and "necessary to allow
employees to develop, improve and avoid discipline."
*Tepperwien*, 663 F.3d at 570.  Such scrutiny does not constitute
materially adverse action absent "other negative results such as
a decrease in pay or being placed on probation."  *Dauer v.
Verizon Commc'ns Inc.*, 613 F. Supp. 2d 446, 461 (S.D.N.Y. 2009),
*vacated on other grounds and remanded sub nom. Pucino v. Verizon
Wireless Commc'ns, Inc.*, 618 F.3d 112 (2d Cir. 2010); *see also
Workneh v. Pall Corp.*, 897 F. Supp. 2d 121, 135 (E.D.N.Y. 2012)
(granting summary judgment to defendants on retaliation claim;
series of meetings held to "scrutinize [plaintiff's] job
performance, and even his daily schedule," along with "increased
scrutiny" of plaintiff's corporate credit card charges, were
insufficient as a matter of law to establish materially adverse
action); *Gentile v. Potter*, 509 F. Supp. 2d 221, 242 (E.D.N.Y.
2007) ("[R]eprimands, threats of disciplinary action, and
excessive scrutiny do not constitute adverse employment
actions.").

     Likewise, yelling is not a materially adverse action.
*See Ziyan Shi v. New York Dep't of State, Div. of Licensing
Servs.,* 393 F. Supp. 3d 329, 338-39 (S.D.N.Y. 2019) (collecting
cases); *Martinez v. New York City Dep't of Educ.*, No. 04-CV-

2728, 2008 WL 2220638, at *12 (S.D.N.Y. May 27, 2008)

("[I]ncidents where Sulner publicly yelled at Plaintiff . . .

constitute, as a matter of law, the sorts of petty slights and

personality conflicts that are not actionable.").

Nor does counseling qualify.  *See Tepperwien*, 663 F.3d

at 570-71 (employee counseling not actionable where it was not

part of a progressive disciplinary process); *Witkowich v. U.S.*

*Marshals Serv.*, 424 F. App'x 20, 22 (2d Cir. 2011) (supervisors'

reprimands and criticisms would not have dissuaded a reasonable

employee in the plaintiff's position from complaining of

unlawful discrimination).  Providing accurate feedback is, of

course, part of the ordinary and appropriate course of personnel

management, and here there is substantial evidence — at least

some of which is undisputed — reflecting Plaintiff's significant

performance challenges.

2.  Counseling Memorandum

Beyond the counseling and increased supervision,

Plaintiff claims that she was "written up" on the basis of

"fabricated" performance issues.  She points to Godek's

memorandum of January 10, 2017.  *See* Pl. Br. at 13; ECF No. 69-9

(counseling memo).[14]  In the memo, Godek described three

---

[14] As set forth above, Plaintiff had received negative feedback on a
number of occasions *prior to* the incidents alleged to constitute a hostile
work environment, and prior to her engaging in any protected reporting

incidents: one in which Plaintiff left the morning meeting "abruptly," claiming that she needed to go pick up a letter for a client; another morning meeting in which Banovich addressed "ongoing issues" on the team and Plaintiff "stared at the ceiling, grimaced, rolled [her] eyes and began doing paperwork" while Banovich spoke; and a training session in which Plaintiff whispered and laughed inappropriately with a colleague.  ECF No. 69-9.  The memo states that Godek and Banovich had spoken to Plaintiff contemporaneously about the first two incidents, with "no improvement"; Godek concluded by saying that if Plaintiff did not make "immediate and sustained improvement," he would be "compelled to recommend further administrative action."  *Id.* The memo called for Plaintiff to sign to "acknowledge receipt" and indicated that a copy would be filed in her "personal history folder" with the Human Resources Department.  *Id.*  The signature block bears the handwritten notation "refused to sign," dated January 12, 2017.  *Id.*

Generally speaking, negative evaluations in a counseling memo are not "adverse employment actions" absent some accompanying adverse consequences.  *Tepperwien*, 663 F.3d at 570 ("[W]e have held, in the context of the issuance of a counseling

---

activity.  For obvious reasons, the negative feedback that predates any instance of protected activity cannot constitute retaliation.  *See Brodt v. City of New York*, 4 F. Supp. 3d 562, 572 (S.D.N.Y. 2014) (adverse actions predating protected activity cannot form basis of a retaliation claim); *Miller v. McHugh*, 814 F. Supp. 2d 299, 319 (S.D.N.Y. 2011) (same).

memo, that criticism of an employee (which is part of training and necessary to allow employees to develop, improve and avoid discipline) is not an adverse employment action.").  The Second Circuit has affirmed the grant of summary judgment against plaintiffs who alleged as much of this type of retaliation as Tringone does, or more.  *See Cody v. Cty. of Nassau*, 345 F. App'x 717, 719 (2d Cir. 2009) (alleged retaliatory actions — including falsely accusing Plaintiff of unauthorized absence, issuing a counseling notice, threatening "future counseling notices and disciplinary actions," "writing her up" for leaving early, and "placing her on a medical review list" — were "not adverse employment actions for purposes of a retaliation claim"); *see also Quadir v. New York State Dep't of Lab.*, 691 F. App'x 674, 675 (2d Cir. 2017); *Verdi v. City of New York,* 306 F. Supp. 3d 532, 544 (S.D.N.Y. 2018) ("Counseling memoranda do not constitute adverse employment actions in retaliation claims under Title VII."); *Ziyan Shi*, 393 F. Supp. 3d at 338 ("Even if the information in the counseling memoranda was false or misleading, this does not constitute an adverse employment action.").[15]

---

[15] Some district courts have suggested that negative performance evaluations can, in certain circumstances, constitute adverse action.  *E.g.*, *Wilson v. New York & Presbyterian Hosp.*, No. 17-CV-5012, 2021 WL 2987134, at *6 (E.D.N.Y. July 15, 2021) (indicating in dicta that "a negative performance evaluation can constitute an adverse employment action in the retaliation

Here, the record reflects that Plaintiff received only a single negative evaluation in writing after engaging in the protected activity at issue.  Under *Burlington* and the cases cited above, this is insufficient as a matter of law.

Moreover, Plaintiff has adduced no evidence tending to prove that the negative feedback was inaccurate, beyond her own assertion.  That assertion is insufficient, without more, as a matter of law.  "At the summary judgment stage, plaintiff must provide more than his subjective belief that he was the subject of retaliation." *Pelletier v. Armstrong*, No. 99-CV-1559, 2007 WL 685181, at *13 (D. Conn. Mar. 2, 2007); *see also Mattera v. JPMorgan Chase Corp.*, 740 F. Supp. 2d 561, 576–77 (S.D.N.Y. 2010) (dismissing retaliation claim based on negative performance evaluation where plaintiff "fail[ed] to identify any evidence that refutes defendants' characterization of his performance").[16]

---

context"); *Dingle v. City of New York*, No. 10-CV-4, 2011 WL 2682110, at *6 (S.D.N.Y. July 7, 2011) (observing, in the First Amendment context, that "a counseling memorandum, as a formal, written reprimand, sufficiently deters the exercise of constitutional rights to constitute an adverse employment action.").  The significant weight of authority, however, is to the contrary, especially as applied to the facts here.

[16] Plaintiff's extensive record of performance issues tends to undermine this basis for her retaliation claim. *See, e.g.*, *Vitale v. Equinox Holdings, Inc.*, No. 17-CV-1810, 2019 WL 2024504, at *13 (S.D.N.Y. May 7, 2019) ("An employee who has been repeatedly reprimanded and who sees the writing on the wall cannot shield herself from legitimate managerial prerogatives by threatening a discrimination complaint and then alleging unlawful retaliation.").

3.   <u>Involuntary Transfer</u>

Finally, Plaintiff leans heavily on the involuntary transfer in her effort to establish an adverse employment action.  She contends, without offering any specifics, that the transfer was akin to an "entry-level position."  Pl. Dep. 151:9.[17]  Whether a transfer constitutes an adverse employment action depends on a "wide variety of factors, including whether the reassignment or transfer led to a diminution in responsibilities, prestige, or opportunity for advancement." *Ragin v. E. Ramapo Cent. Sch. Dist.*, No. 05-CV-6496, 2010 WL 1326779, at *22 (S.D.N.Y. Mar. 31, 2010), *aff'd*, 417 F. App'x 81 (2d Cir. 2011).  A lateral transfer is not, generally speaking, adverse action, even if the transferee objects to it.  *See Dillon v. Morano*, 497 F.3d 247, 255 (2d Cir. 2007) (plaintiff's "personal opinion" that his new assignment placed him in the "least desirable unit" within organization insufficient to establish adverse action); *Morris v. Lindau*, 196 F.3d 102, 113 (2d Cir. 1999); *Ragin*, 2010 WL 1326779 at *23 (no adverse action where plaintiff "had the same job title, pay and benefits" following transfer); *Alers v. N.Y.C. Human Res. Admin.*, No. 06-CV-6131, 2008 WL 4415246, at *7 (E.D.N.Y. Sep. 24, 2008), *aff'd sub nom. Alers v. Hum. Res. Admin.*, 357 F. App'x 330 (2d Cir.

---

[17] In her deposition, Plaintiff admitted that the transfer was, in fact, lateral.  *See id.* at 147:18-148:14; *see also* Pl. 56.1 (NYSOMH) ¶ 42.

2009) (plaintiff's "dissatisfaction with her duties" after transfer, without more, was not a sufficient basis to find that an employment action was adverse).

Nor does a transfer to a less convenient location amount to an adverse action.  "[C]ourts in this Circuit have generally declined to find that transfers (or denials of transfers) amount to adverse employment actions, even in the context of a retaliation claim, where the action results merely in an inconvenience, such as an increased commute or unfavorable hours."  *Taylor v. N.Y.C. Dep't of Educ.*, No. 11-CV-3582, 2012 WL 5989874 at *10 (E.D.N.Y. Nov. 30, 2012) (collecting cases); *Ray v. New York State Ins. Fund*, No. 16-CV-2895, 2018 WL 3475467, at *11 (S.D.N.Y. July 18, 2018) (same).

Plaintiff argues that the Court must consider the full impact of this transfer on her life as a whole — not just the increase in travel time.[18]  For this proposition, she invokes *Vega v. Hempstead Union Free School District*, 801 F.3d 72 (2d Cir. 2015).  *Vega* held that a plaintiff's allegation of a temporary deprivation of pay, among other things, sufficed to allege an adverse employment action when the totality of plaintiff's life circumstances were taken into account.  *Id.* at

---

[18] Plaintiff also argues that her job duties following the proposed transfer would have been diminished, but she cites no facts to support this claim.  *See, e.g.*, Pl. Dep. 152:8-25.

92.  The court noted that "[t]he real social impact of workplace behavior often depends on a constellation of surrounding circumstances, expectations, and relationships which are not fully captured by a simple recitation of the words used or the physical acts performed." *Id.* at 90.  Thus, the court observed that a "schedule change in an employee's work schedule may make little difference to many workers, but may matter enormously to a young mother with school-age children." *Id.*

Invoking *Vega*, Tringone contends that the Defendants knew that she would have difficulty getting her children to day care on time if she was commuting to the new location in Brentwood.  Pl. Dep. 151:5-16.  Though discovery has closed, Plaintiff points to no actual evidence that the Defendants knew this or were motivated by it beyond (again) her own surmise.  Even assuming such knowledge, however, Plaintiff has failed to demonstrate the commuting difficulties she claims.

Plaintiff produced a printout from Google Maps, dated January 7, 2020, estimating that the drive from her children's day care facility to her new work location was twenty-four miles and would take anywhere from thirty-five to eighty-five minutes.  ECF No. 69-24.[19]  Plaintiff admitted, however, that the day care

---

[19] Courts may take judicial notice of internet mapping tools to ascertain driving distances.  *See, e.g.*, *Rindfleisch v. Gentiva Health Sys., Inc.*, 752 F. Supp. 2d 246, 259 n.13 (E.D.N.Y. 2010).

facility was three miles from her home and that it opened at 6:30 a.m.  Pl. 56.1 (NYSOMH) ¶¶ 49-50.  Thus, even assuming the correctness of Google's estimated travel time, Plaintiff would still have been able to get to the new work location before 8:00 a.m., *see* Pl. Dep. 153:14-15 (for 8:00 a.m. start time), with between five and fifty-five minutes to spare.  ECF No. 69-24.  Plaintiff's transfer thus does not constitute an adverse employment action.

In sum, Plaintiff does not "describe a situation, even when viewed in the aggregate, that would deter a reasonable employee from engaging in protected activities."  *Chiang v. Donahoe*, 579 F. App'x 39, 42 (2d Cir. 2014).

### IV.  Conclusion

For the foregoing reasons, the Defendants' motions for summary judgment are both granted.  The Clerk of Court is respectfully directed to enter judgment and close this case.


SO ORDERED.


/s/ Eric Komitee
ERIC KOMITEE
United States District Judge


Dated:    November 15, 2021
          Brooklyn, New York